DR. LUIS E. GONZÁLEZ SALDAÑA, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. MANUEL A. MOREDA, JUEZ, demandado.

Número: C-65-18      Resuelto: 3 de junio de 1965

*Ángel Viera Martínez* y *Jorge Luis Ortiz Viera,* abogados del peticionario; *Luis F. Sánchez Vilella,* abogado del demandado.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Expedimos auto de *certiorari* para revisar la siguiente Resolución de la Sala de San Juan del Tribunal Superior:

"Por entender que el demandante no ha agotado los remedios administrativos que le conceden la Ley Universitaria, se declara con lugar la moción de desestimación en este caso. Notifíquese. San Juan, Puerto Rico, a 21 de enero de 1965."

El 6 de mayo de 1964 el peticionario Dr. Luis E. González Saldaña solicitó auto de *mandamus* del Tribunal Superior contra el Rector de la Universidad, y a tal efecto alegó que él era un empleado permanente de la Universidad de Puerto Rico como catedrático auxiliar adscrito al Instituto de Medicina Legal, permanencia que había adquirido desde el 1ro. de julio de 1960; que sus funciones eran las de supervisión de trabajo de medicina legal y patología forense para lo cual se especializó en la Universidad de Harvard y en la Universidad de Maryland y ostentaba además otros certificados del "American Board of Pathology" en Patología Anatómica y Patología Forense. Que en la capacidad y con las funciones mencionadas el peticionario celebró un contrato con el Secretario de Justicia y con la aprobación del Rector de la Universidad, para ejercer las funciones de patólogo forense del Departamento de Justicia para la supervisión de autopsias médico-legales, comparecencia como perito en medicina forense a los tribunales y asesoramiento a los fiscales, mediante una compensación de $335 por mes, contrato que se hizo para tener vigencia desde el 1ro. de julio de 1960 hasta el 30 de junio de 1961 y que se renovaría cada año fiscal a partir de su vencimiento. Que debido a persecución oficial sistemática sin causa o motivo que lo justificare, el Jefe del Departamento de Patología de la Escuela de Medicina de la Universidad Dr. Raúl A. Marcial lo relevó, sin autoridad para ello, de las funciones del cargo para el cual tenía permanencia en el Instituto de Medicina Legal, y lo trasladó a la Escuela de Medicina en 5 de febrero de 1962, privándole de ese modo que se le renovara en su día el contrato de servicios con el Departamento de Justicia, como en efecto no le fue renovado a partir del 30 de junio de 1962. Que luego el Jefe del Departamento de Patología de la Escuela de Medicina, sin autoridad para ello, trasladó al peticionario al Instituto de Medicina Legal a cargo de las autopsias médico-clínicas del Hospital Municipal de Río Piedras, y en 10 de junio de

1963, sin justificación alguna, trasladó de nuevo al demandante a la Escuela de Medicina de Puerta de Tierra.

Alegó además el peticionario que en 13 de junio de 1963, de manera arbitraria y sin autoridad legal para ello, sin formulación de cargos y sin que hubiera motivo para la formulación de cargos y en violación de sus derechos civiles el Dr. Raúl Marcial le relevó de las funciones totales de su cargo y desde esa fecha y hasta el 26 de febrero de 1964 el peticionario estuvo privado de prestar sus servicios profesionales al Gobierno del Estado Libre Asociado de Puerto Rico, pero recibiendo el sueldo, recibiendo más de $9,000 sin haber podido prestar los correspondientes servicios al gobierno como consecuencia de esa actuación. Que en 25 de febrero de 1964 el Decano de la Escuela de Medicina Dr. Nigaglioni dispuso que el peticionario se personara ante el Dr. Raúl Marcial, y éste lo asignó a la sección de neurología del Departamento de Medicina del Hospital Universitario, bajo limitaciones y condiciones impuestas, a realizar trabajo propio para un residente en violación de los derechos de su cargo permanente, y se le ha privado de realizar labor propia de su especialidad. Que el peticionario se personó en la sección de neurología a cumplir con las obligaciones que le impusieron sin renunciar el derecho a ocupar su cargo permanente de catedrático auxiliar adscrito al Instituto de Medicina Legal, en funciones de supervisión, para el cual tiene su especialización.

Alegó finalmente que antes de incorporarse a la sección de neurología del Hospital Universitario el peticionario requirió al Rector de la Universidad para que le repusiera en su cargo permanente de catedrático auxiliar adscrito al Instituto de Medicina Legal, en funciones de supervisión, y que el demandado aun no lo ha hecho. Que el peticionario no tiene otro remedio para proteger sus derechos que el recurso de *mandamus*, con súplica de que se dicte orden dirigida al Rector de la Universidad para que lo reponga en su cátedra permanente. Como es natural, la petición fue jurada.

Junto con la solicitud de *mandamus* el peticionario acompañó (1) certificación de la Oficina de Personal de la Universidad al efecto de que él desempeña el puesto de Catedrático Auxiliar, Instituto de Medicina Legal en forma permanente desde el 1ro. de julio de 1960; (2) copia del contrato de servicios profesionales con el Departamento de Justicia con un estipendio de $335 mensuales por servicio fuera de las horas laborales de la cátedra; (3) comunicación del Secretario de Justicia fechada 31 de mayo de 1962 dirigida al peticionario comunicándole que toda vez que ya él no prestaba servicios en el Instituto de Medicina Forense, no se le renovaría el contrato a partir del 30 de junio de 1962; (4) comunicación de 10 de junio de 1963 del Dr. Raúl Marcial Rojas al peticionario transfiriéndolo dentro del Departamento de Patología de la Escuela de Medicina, del Hospital Municipal de Río Piedras a labor docente en la Escuela de Medicina en Puerta de Tierra; (5) comunicación de 13 de junio de 1963 del Dr. Marcial Rojas relevando al peticionario de sus obligaciones dentro del Departamento de Patología hasta que su caso fuera estudiado y decidido por el Rector de la Universidad.

La Sala sentenciadora dictó orden para que el Rector mostrara causas por las cuales no debía concederse el *mandamus* solicitado. Compareció el Rector e interpuso moción para desestimar en la que expuso que de acuerdo con la Ley de la Universidad la Junta Universitaria "resolverá las apelaciones que los profesores y los estudiantes, o cualquiera de ellos, establecieran contra actuaciones y decisiones de cualquier decano, facultad o miembro del personal docente, técnico o administrativo"; y que de acuerdo con dicha ley el Consejo Superior de Enseñanza "resolverá las apelaciones que se establecieran contra actuaciones o decisiones del Rector, del Vice Rector o de cualquiera de las Juntas Universitarias". Adujo el Rector en su moción para desestimar que en la demanda no se alegaba que el peticionario hubiera apelado

ante la Junta Universitaria de las actuaciones del Dr. Marcial Rojas, ni ante el Consejo Superior de Enseñanza de las actuaciones del Rector. Que por lo tanto no había agotado los remedios administrativos. Por tales razones pidió que se desestimara la solicitud de *mandamus*. Vista la moción para desestimar, se dictó la Resolución que transcribimos al principio.

Antes de resolver la cuestión planteada la Sala sentenciadora tuvo ante sí los siguientes documentos relacionados con los hechos expuestos en la solicitud: (1) Carta de 28 de mayo de 1963 del Decano de la Escuela de Medicina dirigida al Rector, acompañando otra del Dr. Marcial Rojas en relación con el caso del peticionario. El Decano recomienda que se dejara cesante al peticionario de su puesto hasta tanto se investigaran los cargos presentados contra él por la Oficina del Rector, y que la recomendación se basaba en que era necesario alejar al Dr. González Saldaña del funcionamiento del Departamento de Patología y del Instituto de Medicina Legal, para el buen funcionamiento de esas organizaciones. (2) Memorándum de 19 de junio de 1963 dirigido a la Rectoría con la firma de un Decano en que se hace constar: "Asunto: Autoricé verbalmente al Dr. Marcial para que se suspendiese provisionalmente de empleo al Dr. González Saldaña, pendiente de ulterior decisión del Rector." (3) Carta de 19 de agosto de 1963 del Decano de la Escuela de Medicina Dr. Nigaglioni, dirigida al Rector en donde le manifiesta que el Dr. Raúl Marcial Rojas consideró apropiado someter una serie de cargos al entonces Decano Dr. Vivas, con el propósito de separar al Dr. González del departamento; que después de entrevistas con miembros del Departamento de Patología y con el Dr. González había llegado a la conclusión definitiva de que era imposible que el Dr. González se reintegrara a sus labores en el Departamento de Patología o en el Instituto de Medicina Legal, y que él creía que el problema era uno de desajuste emocional de gran seriedad.

Que el Dr. González Saldaña rehusaba renunciar a su cargo y temía que él (el Dr. González Saldaña) recurriera "a maniobras legales en caso de que se proceda a separarlo de la Escuela". Sin embargo, que el Dr. González Saldaña estaba relevado de sus obligaciones de su Departamento desde el 13 de junio de 1963 pero estaba recibiendo su sueldo y que esto era "un drenaje en nuestra economía." Finalizaba la comunicación del Decano agradeciendo del Rector su opinión sobre el asunto. (4) Comunicación fechada 3 de enero de 1964 del Lcdo. Luis F. Sánchez Vilella dirigida al Rector en donde le informa el resultado de su investigación sobre los cargos que se pretendía formularle al Dr. Luis E. González Saldaña y le expone su criterio sobre la situación.

En 20 de febrero de 1964 el Rector dirigió una comunicación al Dr. Raúl Marcial Rojas informándole que su criterio era que procedía encomendar al Dr. González Saldaña tareas profesionales en el Departamento de Patología.([1])

Hay en el récord y tuvo ante sí también la Sala sentenciadora, una Certificación oficial del Secretario Permanente del Consejo Superior de Enseñanza en cuanto a la "Facultad de Medicina como Miembros del Claustro" en donde se hace constar que el Claustro de Río Piedras lo constituyen las Facultades de Río Piedras, el de Mayagüez las Facultades de Mayagüez y el de San Juan la Facultad de Medicina y de Odontología; que el Claustro de Río Piedras no puede legislar en cuanto a asuntos que competen a la Escuela de Medicina; "que siempre ha funcionado en esa forma, o sea, que de hecho,

---

([1]) Los documentos reseñados se proporcionaron al peticionario por orden del Tribunal en otro pleito suyo sobre estos hechos. Fueron reproducidos en parte e incluidos en un elaborado memorando de ley sometido por el peticionario a la Sala sentenciadora sobre la moción para desestimar.

No debe entenderse que los acreditamos como todos los hechos o toda la verdad de los hechos en los méritos del asunto, cosa que se determinará en su momento. Se consideran, y los debió haber así apreciado la Sala, en cuanto al planteamiento y fallo desestimador por falta de suficiente intervención administrativa. Aun cuando la comunicación del abogado Lcdo. Sánchez Vilella fue aparentemente divulgada, preferimos no revelar su contenido.

el Claustro de Río Piedras nunca ha intervenido con la Escuela de Medicina ni de Odontología''.

A tenor de la Certificación expedida por el Secretario Permanente del Consejo Superior de Enseñanza, no había lugar a intervención administrativa alguna de la Junta Universitaria en el asunto en litigio. En efecto, la Ley de la Universidad, Ley Núm. 135 de 1942, crea una Junta Universitaria de los colegios de la Universidad sitos en Río Piedras, y una Junta Universitaria Especial del Colegio de Agricultura y Artes Mecánicas de Mayagüez.

La Junta Universitaria está constituida por el Rector, quien la preside, el cuerpo de decanos y un representante del Claustro de los colegios universitarios de Río Piedras, y actúa como cuerpo consultivo del Rector. Ejerce otras facultades específicamente dispuestas por ley entre las que no se menciona la de entender en destituciones o separación de puestos. Aunque se dispone que resolverá las apelaciones que los profesores o los estudiantes, o cualquiera de ellos establecieren contra actuaciones y decisiones de cualquier decano, facultad o miembro de personal docente, técnico o administrativo, no vemos que pueda pasar sobre la separación de sus funciones de un catedrático con estado de permanencia, ya que tal facultad de separación no le está concedida a los decanos o a la facultad o cualquier otro miembro del personal docente, técnico o administrativo, excepto el propio Rector.—Ley, Secs. 10, 11.—Además, los hechos demuestran que este asunto estaba bajo la consideración del Rector mismo.

Aparte de lo expuesto, la Certificación aludida demuestra que la Junta Universitaria de Río Piedras como tal, aparte de la Rectoría, no tiene intervención o ingerencia en el funcionamiento de la Escuela de Medicina. La Ley dispone que por ''Claustro Universitario de Río Piedras'' se entenderá los decanos y el personal docente y técnico de los colegios y facultades de la Universidad de Puerto Rico sitos en Río Piedras; que por ''personal docente'' se entenderá los miembros del

claustro universitario y por "facultad" se entiende el personal docente universitario adscrito a un colegio o a una división académica de un colegio.—Ley Núm. 135, Sec. 30.

■ Estatuye la Sec. 9 de la Ley que el Rector nombrará, sujeto a la aprobación del Consejo Superior de Enseñanza, a los decanos de los colegios y facultades y a cierto otro personal, y en consulta con la Junta Universitaria, nombrará el personal docente, técnico y administrativo de la Universidad y todos los demás funcionarios y empleados. En el Rector descansa la facultad de supervisar a todo el personal universitario y las funciones docentes, técnicas y administrativas de la institución, en todos sus colegios, escuelas, facultades y dependencias.

Por Ley se creó la permanencia de los puestos, y dispone la Sec. 16, según fue enmendada por la Ley Núm. 334 de 1949, de la siguiente manera: "La remoción de un miembro del personal universitario, cuyo nombramiento tenga carácter permanente, no podrá hacerse sin la previa formulación de cargos y oportunidad de defensa. No obstante, el Rector podrá, de requerirlo los intereses universitarios, suspender de empleo y sueldo a cualquier miembro del personal universitario hasta tanto se le ventilen los cargos correspondientes".

Más particularmente en lo que se relaciona al peticionario, la Ley Núm. 114 de 1958, enmendadora de la 206 de 1943 estableció, adscrito a la Escuela de Medicina de la Universidad de Puerto Rico, el Instituto de Medicina Legal y concedió facultad al Rector para nombrar su personal con la recomendación del Decano de la Escuela de Medicina, bajo las normas y procedimientos sobre nombramientos vigentes en la Universidad de Puerto Rico. El Director del Instituto es el Catedrático de Medicina Legal de la Universidad de Puerto Rico, a cargo del adiestramiento de aquellos médicos que deseen cursar estudios postgraduados en las materias de medicina legal y forense.

486

■  A tenor de las disposiciones de ley consideradas, nos parece claro que la facultad para privar al peticionario de su posición permanente en el Instituto de Medicina Legal reside únicamente en el Rector, previa formulación de cargos y oportunidad de defenderse. Una decisión del Rector separando de su cargo a un catedrático permanente es apelable ante el Consejo Superior de Enseñanza.—Ley, Sec. 5.

■  El récord del caso, sin embargo, no presenta un curso de acción orientado en esa forma. Al peticionario, según los hechos expuestos por él bajo juramento que han de tomarse como ciertos a los efectos de la moción para desestimar, no se le permite disfrutar de las prerrogativas de su cátedra que resulta ser una altamente especializada bajo normas de la propia ley creadora del Instituto. Por otra parte, y a pesar de haber subsistido esa situación por más de tres años, tampoco se le formulan cargos para desposeerlo de la misma, de modo que haya una decisión del Rector de la cual el peticionario pueda ir en alzada ante el Consejo Superior de Enseñanza. El tratamiento del asunto administrativamente en los varios niveles superiores del peticionario se presenta con alguna confusión. Se mencionan cargos que nunca se formularon ya fuera porque no había suficiente motivo o justificación, y el récord da base para creer que el Rector pudo así estimarlo, o por el temor de que se acudiera a "maniobras legales" en caso de separársele de la Escuela. Después de haber dispuesto el Rector en febrero 20, 1964, que se encomendara al peticionario tareas profesionales en el Departamento de Patología y habérsele enviado en 25 de febrero a la sección de neurología del Departamento de Medicina del Hospital Universitario, el peticionario requirió una vez más al Rector que lo repusiera en su cátedra en el Instituto de Medicina Legal sin que a ello se haya aún accedido, y sin que tampoco se le hayan formulado cargos para separarlo definitivamente del Instituto.

■ Visto ese largo historial administrativo no puede decirse que se ha ido a los tribunales sin agotarse dicha esfera de acción, o en desconocimiento administrativo del asunto. En una situación así, en que el derecho del peticionario se encuentra atascado en el ir y venir de un proceso administrativo que no se resuelve en definitiva,, ante el mandato claro de la Ley que impide la separación sin formulación de cargos, está en orden el uso por los tribunales de la alta prerrogativa del *mandamus* para el rescate de su derecho de ley. *Núñez* v. *Benítez, Rector*, 65 D.P.R. 864, 868 (1946) ; *Pérez Marchand* v. *Garrido*, 48 D.P.R. 457, 473 (1935) ; *Gil* v. *Chardón*, 41 D.P.R. 210, 218 (1930).

■ Hay situaciones en que por disposición expresa de ley los tribunales están impedidos de conocer de ciertos asuntos litigiosos hasta tanto no haya recaído en los mismos una decisión en la esfera administrativa. Casos típicos como por ejemplo, los pleitos sobre prácticas ilícitas del trabajo, las relaciones de inquilinato y de precios, los accidentes del trabajo, litigios contributivos, y otros por el estilo. No estamos en el caso de autos ante una de esas situaciones. Si bien es cierto que hay normas judiciales conocidas al efecto de que es preferible agotar la acción administrativa antes de acudir a lo judicial por cuanto ello es deseable para un mejor y más fácil ordenamiento en la disposición de conflictos de esta naturaleza, la norma es una de conveniencia compatible con la justicia, y no posee inflexibilidad tal que lleve a la frustración de un derecho o a la negación de un remedio.

■ Nos parece, en las circunstancias del récord, que ése es el resultado a que se llegaría de cerrarle las puertas del Tribunal al peticionario. Quedaría indefinidamente en la misma situación en que ahora se encuentra: sin el desempeño de su cátedra para la cual calificó especialmente y sin una decisión administrativa en los méritos después de un proceso de formulación de cargos con derecho a defenderse que le libre de las imputaciones en detrimento de su prestigio pro-

fesional o que le permita en su día la revisión judicial en forma ordinaria. Está en orden, por esa razón, la intervención judicial de manera extraordinaria mediante el recurso de *mandamus*.

*Se anula la resolución que declaró con lugar la moción para desestimar, y se devolverán los autos con instrucciones de que se ordene, conforme a la Regla 55, que el Rector presente prontamente una contestación en los méritos de la petición de mandamus.*

