ASOCIACIÓN DE RESIDENTES DE PIÑONES, INC., apelada y recurrida, *v.* JUNTA DE CALIDAD AMBIENTAL y JUNTA DE PLANIFICACIÓN, demandadas y apelantes; PFZ PROPERTIES, INC., interventora y peticionaria.

*Número:* CC-97-49          *Resuelto:* 4 de marzo de 1997

Lizzie Tomasini, abogada de la peticionaria.

## RESOLUCIÓN

A la petición de *certiorari* presentada, *no ha lugar*.

Lo acordó el Tribunal y certifica el Señor Secretario del

Tribunal Supremo. El Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad. Los Jueces Asociados Señores Rebollo López y Señora Naveira de Rodón expedirían.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario del Tribunal Supremo*

— O —

Voto particular de conformidad emitido por el Juez Asociado Señor Hernández Denton.

Estamos conformes con la resolución emitida por el Tribunal que denegó la petición de *certiorari* presentada por PFZ Properties, Inc. Coincidimos en su totalidad con las conclusiones del Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones, en cuanto a que la Junta de Planificación (en adelante J.P.) no podía resolver una consulta de ubicación de un proyecto del efecto y la magnitud del aquí tratado sin la previa preparación de una declaración de impacto ambiental, según es requerida por el Art. 4(c) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c). La construcción de dos mil (2,000) unidades de vivienda y un centro turístico y comercial en el área periférica del manglar de Piñones-Torrecilla-Vacía Talega, el manglar de mayor cabida en Puerto Rico, claramente tendrá un impacto significativo sobre el ambiente. Por ende, la J.P. tiene un claro e ineludible deber de preparar una declaración de impacto ambiental antes de adjudicar la consulta en sus méritos.

I

La peticionaria, a través de la compañía Basora & Rodríguez y Asociados, sometió ante la J.P. una consulta de ubicación para el desarrollo de un proyecto residencial turístico que habría de ser ubicado en un predio de terreno

en el barrio Torrecilla Baja de Loíza.([1]) El proyecto consiste de dos mil (2,000) unidades de vivienda, ocho (8) piscinas, trece (13) canchas de tenis, dos mil quinientos (2,500) espacios en un estacionamiento soterrado y un área comercial de cincuenta mil (50,000) pies cuadrados. El área, donde se planifica establecer el Proyecto, colinda al sur con la periferia del manglar de Piñones-Torrecilla-Vacía Talega: el manglar más grande de Puerto Rico.

La J.P., como agencia proponente, preparó una evaluación ambiental (en adelante EA) del proyecto.([2]) Ésta fue circulada a varias entidades públicas y privadas, entre ellas la Junta de Calidad Ambiental (en adelante J.C.A.). En unas vistas públicas celebradas en Loíza para discutir los aspectos ambientales del proyecto, los opositores sostuvieron que la J.P. no había cumplido con la Ley sobre Política Pública Ambiental al no preparar una declaración de impacto ambiental.

Mediante Carta de 27 de junio de 1995, el Departamento de Recursos Naturales y Ambientales (en adelante el D.R.N.A.) advirtió que el desarrollo estaría dentro del Área de Planificación Especial de Piñones (A.P.E.P.). En particular señaló que "[e]sta área es en la actualidad uno de los sistemas naturales más importantes de Puerto Rico, comprendiendo aproximadamente 10,000 cuerdas de terreno. ... Los terrenos comprendidos dentro del A.P.E.P. tienen un gran valor ecológico. Ese valor radica en la gran variedad y diversidad de vida silvestre que este sistema contiene". Caso Núm. CC-97-49, Primera Pieza, Apéndice,

---

([1]) Tanto la sentencia de instancia como la del Circuito manifestaron que el proyecto se ubicaría en Torrecilla Alta. Sin embargo, este barrio está localizado en Canóvanas, mientras que Torrecilla Baja pertenece a Loíza y su zona costera es conocida como Vacía Talega. El área que comprende Torrecilla Baja es comúnmente denominada Piñones aunque el ámbito territorial de este último incluye a los municipios de Carolina, Loíza y Canóvanas.

([2]) La evaluación ambiental (en adelante EA) se define cono "un proceso público conciso cuyo propósito es proveer suficiente información en un documento para que la agencia proponente determine si se requiere la preparación de una DIA Preliminar [declaración de impacto ambiental preliminar] una Determinación de Impacto Ambiental no significativo (D-N)". Sec. 3.1.1. del Reglamento sobre declaraciones de impacto ambiental de 1ro de junio de 1984, Junta de Calidad Ambiental, pág. 10.

pág. 531. Además recordó que el "Area Natural de Piñones contiene el área de mangle más grande en Puerto Rico, teniendo todos los tipos de mangle en la isla y representando un área sumamente importante como productora de nutrientes para alimentar el sistema de vida marina .... Esta condición hace de estos terrenos unos ecológicamente sensitivos". Caso Núm. CC-97-49, Primera Pieza, Apéndice, pág. 532.

Sin embargo, la J.C.A. concluyó que no era necesario someter una declaración de impacto ambiental, aunque reconoció que el proyecto residencial turístico estaría localizado dentro del Área de Planificación Especial de Piñones y que había que cumplir estrictamente con los requisitos del D.R.N.A.

Después de celebrar la vista pública, la J.P. concluyó que la propuesta no tendría un impacto ambiental significativo y que no prepararía la mencionada declaración. Ese mismo día, la J.P. aprobó condicionalmente la consulta de ubicación.

Oportunamente, la Asociación de Residentes de Piñones, Inc., representada por la Clínica de Asistencia Legal de la Universidad de Puerto Rico, presentó ante el Tribunal de Primera Instancia una petición de *mandamus* para solicitar que se ordenara a la J.C.A. que exigiera a la J.P. la preparación de una declaración de impacto ambiental. También solicitó que el foro de instancia dejara sin efecto la consulta de ubicación, hasta tanto se cumpliera con los requisitos de la Ley sobre Política Pública Ambiental. Ambos remedios fueron incoados al amparo del Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*, y del plan de uso de terrenos para el Área de Planificación Especial de Piñones. La peticionaria, PFZ Properties, Inc. solicitó su intervención en el pleito.

Después de celebrar vistas y estudiar los alegatos correspondientes, el Tribunal de Primera Instancia, Sala Superior de Carolina (Hon. Haydee Pagani Padró, Juez), en una sentencia detallada expidió el auto solicitado y dejó sin efecto la aprobación de la consulta de ubicación hecha por

la J.P. Ordenó a esta última que sometiera ante la J.C.A. la declaración de impacto ambiental. Concluyó que la J.P. había aprobado la propuesta sin tener un conocimiento informado de las consecuencias ambientales del proyecto propuesto "en un área en extremo sensitiva desde el punto de vista ecológico para el país y que presenta características tan especiales". Determinó que la J.C.A. tenía la obligación de requerir que se sometiera una declaración de impacto ambiental, pues lo contrario constituía una violación al mandato expreso de la Ley sobre Política Pública Ambiental.

Inconformes con este dictamen la J.P., la J.C.A. y PFZ Properties, Inc. apelaron al Tribunal de Circuito de Apelaciones, Circuito Regional VII, Carolina y Fajardo. El Panel integrado por los Jueces Arbona Lago, Negroni Cintrón y Salas Soler, como Juez Ponente, consolidó los recursos y dictó una extensa y bien fundamentada sentencia confirmatoria del dictamen apelado. El Tribunal de Circuito de Apelaciones concluyó que la preparación de una declaración de impacto ambiental, en proyectos como el de autos, era mandatoria. Dicho foro concluyó que "el lugar propuesto para la construcción del proyecto Las Palmas es uno, repetimos, ecológicamente sensitivo. Ello requirió que se aprobara el Plan de Usos, Área de Planificación de Piñones (A.P.E.P.) en el año 1975 mediante Orden Ejecutiva del Gobernador .... La localización del proyecto requeriría una DIA, con todas sus formalidades más que un E.A. que enmarca un estudio ambiental de menor jerarquía y de carácter general". (Cita omitida.) Sentencia del Tribunal de Circuito de Apelaciones, pág. 18.

La PFZ Properties, Inc. recurre debido a esta decisión. Alega que tanto el foro de instancia como el Tribunal de Circuito de Apelaciones erraron al concluir que la J.P. tenía el deber ministerial de preparar una declaración de impacto ambiental. Además expone que la decisión del Tribunal de Primera Instancia fue emitida sin una vista evidenciaria a tenor con las disposiciones de la Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

## II

En su petición, la PFZ Properties, Inc. aduce que en el caso de autos no procedía la expedición de un auto de *mandamus*, ya que: (1) la actuación solicitada (preparación de una Declaración de Impacto Ambiental) no constituye un acto ministerial, sino discrecional, y (2) la Asociación de Residentes de Piñones tenía un remedio adecuado y disponible en ley (la revisión judicial provista por la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico).

Al examinar esta petición, recordemos que el *mandamus* es un recurso extraordinario de equidad, "altamente privilegiado", que emite el Poder Judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir con un acto que la ley expresamente ordena como un deber resultante de un empleo, un cargo o una función pública. Arts. 649 y 650 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. secs. 3421 y 3422). *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994). La frase "altamente privilegiado" significa que la expedición del auto no se invoca como cuestión de derecho, sino que descansa en la sana discreción del foro judicial. *Ortiz v. Muñoz, Alcalde de Guayama*, 19 D.P.R. 850 (1913). El tribunal emite el auto sólo cuando está convencido de que con él se cumplirán propósitos de utilidad social e individual. *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960).

El requisito primordial del recurso es que se trate de un deber impuesto por ley. Esto ha sido acuñado bajo el término "deber ministerial". La jurisprudencia ha establecido que la determinación de la procedencia del auto depende de si la actuación solicitada es un deber ministerial o si por el contrario implica el ejercicio de discreción, en cuyo caso no puede expedirse. *Álvarez de Choudens v. Tribunal Superior*, 103 D.P.R. 235 (1975); *Partido Popular v. Junta de Elecciones*, 62 D.P.R. 745 (1944). No obstante, la distinción entre lo que constituye un deber ministerial o una actuación discrecional, de ordinario, no es muy clara ni sencilla.

Véase D. Rivé Rivera, *Recursos Extraordinarios*, 1996, pág. 110. La determinación final dependerá de la interpretación del estatuto orgánico de la agencia que hagan los tribunales sobre el grado de discreción conferido por la Asamblea Legislativa.

En lo referente a la discreción ejercida por las juntas y agencias administrativas en asuntos cuasi-adjudicativos, hemos afirmado consistentemente el uso del Poder Judicial para expedir el *mandamus*, una vez se demuestre que el organismo abusó de su discreción. Para hacer esta determinación hay que examinar si la agencia actuó dentro de los poderes conferidos o si se extralimitó. Si la agencia actúa de forma *ultra vires*, el *mandamus* es un remedio "para devolver al cauce de lo estatuido la conducta administrativa". D. Fernández, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, Colombia, Ed. Forum, 1988, pág. 570.

No obstante, si existe un recurso adecuado y eficaz en el curso ordinario de la ley, el remedio no puede expedirse. Art. 651 del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 3423). Normalmente se invoca como limitación para recurrir al *mandamus* el no haber agotado los remedios administrativos. *Carvajal v. Com. Policía Insular*, 68 D.P.R. 763 (1948); *Soltero v. Piris*, 49 D.P.R. 387 (1936); *Rivas v. El Consejo Ejecutivo et al.*, 16 D.P.R. 670 (1910). Sin embargo, hemos reconocido que esta norma es de conveniencia compatible con la justicia y no puede ser tan inflexible que redunde en la frustración de un derecho o en la negación de un remedio. *González Saldaña v. Tribunal Superior*, 92 D.P.R. 477 (1965). Al considerar su expedición, "el factor de mayor importancia y peso es el posible impacto al interés público". *Noriega v. Hernández Colón*, supra.

## III

Nos corresponde determinar si la Asociación de Residentes de Piñones tenía legitimación activa para solicitar

la expedición de un *mandamus* en el caso de autos. La propia Ley sobre Política Pública Ambiental, en su artículo 19 (12 L.P.R.A. sec. 1139), expresamente concede legitimación activa a "cualquier persona natural o jurídica afectada por la falta de implementación de [esa Ley]" para instar ante el Tribunal de Primera Instancia una solicitud de *mandamus* para que se cumpla con lo dispuesto en dicho estatuto.

Uno de los deberes más importantes que la Ley sobre Política Pública Ambiental impone a las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado es la preparación de una declaración de impacto ambiental "antes de efectuar una acción o promulgar una decisión gubernamental que afecte significativamente la calidad del medio ambiente". 12 L.P.R.A. sec. 1124(C). Esta declaración asegura que las agencias e instrumentalidades públicas cumplan estrictamente su obligación de tomar en consideración, al "máximo grado posible", las consecuencias ambientales de sus actuaciones y decisiones. Este informe no sólo ayuda a la agencia en su proceso decisional, sino que también facilita que las otras entidades públicas y la ciudadanía estén debidamente informadas de las consecuencias ambientales de una acción dispuesta por el Estado y puedan fiscalizar con efectividad todas las etapas de la acción propuesta.

La ley establece un procedimiento que requiere que las agencias examinen con cuidado las consecuencias de las propuestas. Este procedimiento tiene que ser cumplido de forma estricta por las agencias e instrumentalidades del Estado, cuando estén evaluando una acción que afecte significativamente el ambiente. Corresponde a la J.C.A. implantar las disposiciones de la Ley sobre Política Pública Ambiental y asegurarse de que las agencias cumplan rigurosamente con sus disposiciones, en particular, en cuanto a la preparación de una declaración de impacto ambiental.

A tenor de este ordenamiento, la J.C.A. aprobó el Reglamento sobre Declaraciones de Impacto Ambiental y el Manual para la Preparación, Evaluación y el Uso de las De-

claraciones de Impacto Ambiental. El manual describe cuidadosamente cuáles son las acciones gubernamentales que afectan de forma significativa el ambiente y que "indefectiblemente" requieren una declaración. Sec. 9(c) del Manual para la Preparación, Evaluación y el Uso de las Declaraciones de Impacto Ambiental de 19 de diciembre de 1972, Junta de Calidad Ambiental. En particular, el manual requiere que se presente una declaración de impacto ambiental cuando la acción gubernamental afecte "las características naturales existentes de las áreas costeras, playas, manglares, arrecifes, ríos, lagos, desfiladeros, caídas de agua, bosques públicos, reservas o refugios de vida silvestre, parques públicos y otras áreas de estado natural". Íd., pág. 16.

A la luz de esta normativa, el foro apelativo concluyó correctamente que

[e]n el presente caso la discreción administrativa tenía que ceder ante el deber ministerial de realizar una DIA. *Se trata de uno de los casos más idóneos para realizar una profesional, honesta y verdadera DIA y no una EA para meramente cumplimentar un expediente administrativo* ....

La EA examinada devela en varias de sus partes que la agencia proponente debió observar los contundentes problemas ambientales y de infraestructura y las palpables omisiones que presenta el proyecto según presentado. Las banderas rojas izadas a toda asta en la propia EA debieron haber precavido a la J.P., J.C.A. y al proponente PFZ que el proyecto amerita para su cabal consideración una DIA sin reparo o dilación alguna. (Énfasis suplido.) Sentencia del Tribunal de Circuito de Apelaciones, págs. 17–18.

En apoyo de esta conclusión, debemos resaltar el hecho de que la mera localización del proyecto propuesto en una zona ecológicamente sensitiva, requería que la J.P. preparara una declaración de impacto ambiental. Se deduce de la sola descripción de las dimensiones del proyecto que éste tendría un impacto ambiental significativo en la ubicación propuesta. De hecho, el Plan de Uso de Terrenos, Área de Planificación Especial de Piñones se estableció principalmente por la imperiosa necesidad de lograr la protección,

conservación y restauración de los sistemas naturales que componen el área de Piñones.

Así lo advirtió el D.R.N.A. en su comunicación de 27 de junio de 1995 a la J.P. En su misiva el mencionado departamento señaló que el desarrollo residencial-turístico propuesto estaba dentro del Área de Planificación Especial de Piñones, "uno de los sistemas naturales más importantes de Puerto Rico, comprendiendo aproximadamente 10,000 cuerdas de terreno. La Reserva Natural de Piñones está localizada dentro de esta área. Los terrenos tienen gran valor ecológico. Ese valor radica en la gran variedad y diversidad de vida silvestre que este sistema contiene". Caso Núm. CC-97-49, Primera Pieza, Apéndice, pág. 62. Además, "contiene el área de mangle más grande en Puerto Rico, teniendo todos los tipos de mangle en la isla y representando un área sumamente importante como productora de nutrientes para alimentar el sistema de vida marino". Caso Núm. CC-97-49, Primera Pieza, Apéndice, pág. 63. Tomamos también conocimiento judicial de que éste es uno de los pocos lugares dentro del área metropolitana de San Juan que posee una extraordinaria belleza con unas playas, dunas de arena, arrecifes de coral, lagunas, palmares, peces y pájaros de gran importancia ecológica para nuestro país.

En vista de las advertencias del D.R.N.A., y a la luz de su propia normativa que decreta el área de Piñones como una de singular importancia ambiental, es evidente que la J.P. y la J.C.A. tenían el deber ministerial de exigir una declaración de impacto ambiental con un estudio más profundo sobre los posibles impactos ambientales del proyecto propuesto por PFZ Properties, Inc. Negarse a preparar la declaración de impacto ambiental constituyó un abuso de discreción.

IV

PFZ Properties, Inc. también sostiene que no procedía el *mandamus* porque la Asociación de Residentes de Piñones

tenía a su disposición el recurso de revisión judicial provisto por la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico. No tiene razón.

El Tribunal de Circuito de Apelaciones correctamente concluyó que la revisión judicial no era el vehículo procesal adecuado, ya que la resolución de la J.P. de 8 de febrero de 1996 se limitaba a adjudicar los méritos de la consulta de ubicación y no la procedencia de una declaración de impacto ambiental.

De la propia resolución se desprende que únicamente se le prestó atención a las características generales del proyecto, su ubicación, el acceso terrestre a éste, la inversión planificada y la generación de posibles empleos. Sorprende la poca consideración que —a juzgar por esta resolución— le dio la J.P. a los impactos ambientales que tendría el proyecto sobre esta zona de tanta importancia ecológica. Evidentemente, la J.P. ignoró los señalamientos del D.R.N.A. y de los grupos de residentes sobre las consecuencias ambientales de la acción propuesta. Por ende, el mecanismo de revisión dispuesto en la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico no era adecuado ni eficaz para encauzar el reclamo de la Asociación de Residentes de Piñones antes de que comenzara la labor de construcción del proyecto y la destrucción de las áreas de valor ecológico.

## V

En su segundo señalamiento de error, la PFZ Properties, Inc. aduce que el foro apelativo incidió al confirmar la sentencia del Tribunal de Primera Instancia sin que éste celebrara una vista evidenciaria a tenor de las disposiciones de la Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. II. Dicha regla dispone que cuando se solicite el auto de *mandamus* y "el derecho a exigir la inmediata ejecución de un acto sea evidente y aparezca que no se podrá dar ninguna excusa para no ejecutarlo, el tribunal podrá ordenar

perentoriamente la concesión del remedio". Sin embargo, cuando no existen esas condiciones, se ordenará la contestación y se celebrará una vista.[3]

Del texto de la citada Regla 55 se desprende claramente que tanto la celebración de la vista como el recibir prueba en ella dependerá de si el tribunal considera que ésta es necesaria para resolver la controversia ante su consideración. En el caso de autos, la celebración de la vista recaía en la sana discreción del tribunal.

De hecho, el foro de instancia celebró una vista a la que comparecieron todas las partes interesadas y, según surge de las minutas, tanto la peticionaria como la J.P. y la J.C.A. tuvieron la oportunidad de exponer sus posiciones. Además, antes de emitir su sentencia el Tribunal de Primera Instancia tomó en consideración los escritos de las partes y examinó el expediente administrativo. Un estudio independiente del alegato del peticionario y de los apéndices nos convencen de que el foro de instancia tenía toda la prueba necesaria para cumplir con su obligación de resolver sin mayor dilación la petición de la Asociación de Residentes de Piñones.

Por los fundamentos antes expuestos estamos conformes con la denegación de la petición de *certiorari* de PFZ Properties, Inc. Claramente, como bien concluyó el Tribunal de Primera Instancia, en este caso "la Junta de Planificación aprobó la propuesta sin tener un conocimiento informado de las consecuencias e impacto al ambiente de un proyecto propuesto en un área en extremo sensitiva desde el punto de vista ecológico para el país y que presenta características tan especiales". Sentencia del Tribunal de Primera Instancia, pág. 9. Correspondía al Poder Judicial evi-

---

[3] La Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. II, fue enmendada mediante la Ley Núm. 249 de 25 de diciembre de 1995, a fin de atemperarla a la nueva estructura judicial creada por la Ley de la Judicatura de Puerto Rico de 1994. El primer párrafo de la referida regla no sufrió cambio alguno, por lo que continúa en vigor el procedimiento allí dispuesto referente a la expedición del auto de *mandamus*.

tar que, por la omisión de estas agencias, se causara un daño ecológico irreparable a esta área tan neurálgica en nuestro país.