# 2001 DTA 103

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**

MUNICIPIO DE GUAYNABO
Apelante

v.

JUNTA DE PLANIFICACION, ADMINISTRACION DE REGLAMENTOS Y PERMISOS,
RIO CONSTRUCTION CORP., SUPER ASPHALT PAVEMENT CORP.
Apeladas

Núm. KLAN-00-01064

San Juan, Puerto Rico, a 24 de enero de 2001

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano,
y los Jueces Aponte Jiménez y González Román

Alfonso de Cumpiano, Jueza Ponente

43

## TEXTO COMPLETO DE LA SENTENCIA

Se nos plantea en este recurso por el Municipio de Guaynabo (el Municipio) que erró el Tribunal de Primera Instancia, Sala Superior de San Juan, al desestimar la demanda de sentencia declaratoria y *mandamus* que presentó contra la Junta de Planificación (la Junta), la Administración de Reglamentos y Permisos (ARPE), Río Construction Corp. y Super Asphalt Pavement Corp. (Río Construction). En la demanda, el Municipio impugnó la aprobación de una consulta de ubicación y la otorgación de permisos a Río Construction para un proyecto industrial. Solicitó se dejaran sin efecto decisiones administrativas en torno al proyecto por su alegada nulidad.

Consideradas las posiciones de las partes, ■ el expediente y el derecho aplicable, determinamos confirmar la sentencia apelada.

### I

Conforme los hechos que surgen del expediente, el 4 de octubre de 1990, el Sr. Bruno Mazza, Presidente de Río Construction, solicitó, mediante consulta de ubicación, la aprobación de un proyecto consistente en la creación de cuatro solares para el establecimiento de una planta de asfalto, una fábrica de bloques, un estacionamiento para equipo de construcción pesado y almacenes. El referido proyecto se llevaría a cabo en tres fincas del Barrio Camarones del Municipio de Guaynabo. Luego de publicar el aviso correspondiente, la Junta de Planificación celebró vista pública. Celebrada ésta, la oficial examinadora a cargo del caso rindió un informe en el cual hizo constar las entidades gubernamentales que endosaron o se manifestaron en torno al proyecto y la oposición por parte del Municipio, el Hon. Salomón Rondón, Representante a la Cámara, y vecinos del sector. Esta se basó principalmente en aspectos ambientales. Apéndice del recurso, págs. 86 y 87.

En virtud de lo anterior, la oficial examinadora recomendó que, previo a que se tomara una determinación sobre el proyecto propuesto se suplementara la evaluación ambiental para incluir cada uno de los usos a ser ubicados en los solares industriales. Añadió que si luego de ello se determinaba que el proyecto no ocasionaría impacto ambiental adverso o que pudiera mitigarse su impacto, debía aprobarse bajo todas aquellas condiciones que la Junta estimara necesarias y pertinentes para el interés público. Apéndice del recurso, pág. 90.

El 13 de marzo de 1992, la Junta de Planificación autorizó la consulta para la ubicación de los cuatro solares industriales y acogió las recomendaciones de la oficial examinadora. Apéndice del recurso, págs. 58-68. La vigencia de la referida autorización fue de un año a partir de su aprobación.

El 31 de enero de 1996, luego de casi tres años de expirada la autorización de la consulta, Río Construction solicitó la reapertura del caso para continuar con las etapas posteriores del proyecto. La solicitud fue acogida por la Junta de Planificación, y mediante la sexta extensión aprobó la reapertura de la consulta, el 13 de febrero de 1996. En su resolución aprobatoria, la Junta aclaró que se autorizaban los usos específicos según sometidos en la consulta. Apéndice del recurso, pág. 70.

Río Construction procedió con los trámites requeridos para la ejecución del proyecto obteniendo la autorización de ARPE para el desarrollo preliminar, el 8 de agosto de 1999. El 8 de octubre de 1999, ARPE expidió permiso de construcción para la planta productora de hormigón asfáltico. En noviembre de 1999, el Municipio solicitó intervención en el caso ante la Junta de Planificación y ARPE. Recurrió en auxilio de jurisdicción ante la Junta para que se dejase sin efecto la sexta extensión de la consulta aprobada en 1996. Solicitó además que ARPE ordenara la paralización de las obras y presentó moción sobre incompatibilidad de la consulta con el Plan de Ordenamiento Territorial aprobado para el Municipio. Posteriormente, solicitó de ARPE la revocación del permiso preliminar y del permiso de construcción previamente concedidos. La Junta declaró sin lugar lo solicitado por el Municipio en resolución notificada el 9 de diciembre de 1999. Apéndice del recurso, págs. 146-147. Consta en autos solicitud de reconsideración del Municipio fechada 15 de diciembre de 1999. Apéndice del recurso, pág. 148.

El 20 de diciembre de 1999, el Municipio presentó ante el Tribunal de Primera Instancia la demanda objeto de este recurso en solicitud de sentencia declaratoria y *mandamus*. En ésta, al igual que en los trámites administrativos, impugnó la sexta extensión de la consulta de ubicación solicitando que se dejara sin efecto por ser nula bajo diversas disposiciones de ley y reglamentarias, incluyendo las disposiciones de la Ley Sobre Política Pública Ambiental. Río Construction solicitó la desestimación de la demanda bajo el fundamento de que su propósito era revisar las determinaciones administrativas, lo que es contrario a la ley. La Junta solicitó también la desestimación por similares planteamientos. El Municipio solicitó sentencia sumaria a su favor.

Por otra parte, en la continuación del proceso administrativo, la Junta de Planificación dejó en suspenso la consulta de ubicación ante la solicitud de Río Construction de que se aclarara que la planta de asfalto se podía ubicar en cualquiera de los solares autorizados. Consideró que tal solicitud era una enmienda a la consulta aprobada y requirió que se sometiera una Evaluación Ambiental de conformidad con la reglamentación de la Junta de Calidad Ambiental (JCA) para evaluar la totalidad del proyecto según propuesto y celebrar vista pública. En reconsideración, la Junta permitió al Municipio intervenir en los procedimientos.

Previo a la vista pública, Río Construction presentó el Estudio Ambiental solicitado para la evaluación de la enmienda. En éste se evaluó el efecto ambiental de la totalidad del Proyecto incluyendo: la productora de hormigón asfáltico caliente, la fábrica de bloques, almacenes, el taller para reparar equipo pesado y estacionamiento. El estudio concluyó que el proyecto propuesto generaría efectos sobre el aire, aguas superficiales y ruido. No obstante, señaló que para cada uno de los elementos se habían diseñado medidas de mitigación que manejan de forma adecuada su efecto, por lo cual no se esperaba que el proyecto tuviera impacto significativo sobre la calidad del ambiente, bienestar y salud humana. Apéndice del recurso, pág. 488. Este estudio fue acogido por la Junta de Planificación, el 24 de abril de 2000.

En el proceso judicial, luego de varios trámites que constan en la sentencia apelada, el tribunal declaró sin lugar la demanda presentada por el Municipio. Concluyó, en esencia, que la solicitud de *mandamus* tenía como propósito la revisión de todas las gestiones procesales de la Junta de Planificación y ARPE y que, teniendo disponible el mecanismo de revisión para la evaluación en los méritos de las decisiones administrativas ante el Tribunal de Circuito de Apelaciones, el Municipio estaba impedido de utilizar el recurso de *mandamus* para tales propósitos. En cuanto a las alegaciones de falta de cumplimiento con la Ley Sobre Política Pública Ambiental, concluyó que el documento ambiental, presentado en ocasión de examinar la solicitud de enmienda a la consulta de ubicación, cumplió con las recomendaciones sobre el análisis de los usos industriales sometidos y de su impacto acumulativo en el ambiente. Por ello, el tribunal entendió improcedente el recurso de *mandamus* provisto por el artículo 20 de la Ley Núm. 9 de 18 de junio de 1970, enmendada, Ley Sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1139. (Supl. 2000).

Inconforme con la decisión, el Municipio presentó este recurso de apelación en el que señala como error del tribunal el determinar improcedente el *mandamus* y la sentencia declaratoria por no haberse agotado los remedios administrativos. Arguye que ante el incumplimiento con las disposiciones de las leyes y reglamentos que las agencias concernidas vienen obligadas a administrar y que afectan a los residentes del Barrio Camarones y el Plan de Ordenamiento Territorial, procede la acción instada. Plantea, además, que erró el tribunal al no determinar que es nula la actuación de la Junta al autorizar una enmienda a una consulta que había perdido vigencia y que incumplía con el Plan de Ordenamiento Territorial, con los requisitos para cambio de zonificación y con la Ley Sobre Política Pública Ambiental.

## II

En el análisis de los errores planteados, debemos examinar las características particulares del recurso de *mandamus* para constatar si aplica a los hechos particulares de este caso.

El *mandamus* es un recurso extraordinario de equidad, altamente privilegiado, que emite el poder judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir un acto que la ley

45

expresamente ordena como un deber resultante de un empleo, cargo o función pública. Artículos 649 y 650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421 y 3422. Tiene que tratarse de un deber impuesto por ley, entiéndase un deber ministerial del funcionario o la agencia contra quien se solicita. Por ser privilegiado el auto, su expedición descansa en la sana discreción del foro judicial. El tribunal lo emitirá sólo cuando está convencido de que se cumplirán propósitos de utilidad social e individual. Deberá velar por los intereses públicos que puedan ser perjudicados por su expedición, evitando la intromisión indebida en los procedimientos del poder ejecutivo y cerciorándose de que su expedición no da lugar a desórdenes, confusión o a perjuicios de los derechos. *Noriega Rodríguez v. Hernández Colón*, 135 D.P.R. 406, 447-448(1994); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264, 283 -284 (1960).

El *mandamus,* como recurso para dejar sin efecto actuaciones administrativas debido a error manifiesto o abuso de discreción, ha sido desplazado por el procedimiento provisto en la Ley de Procedimiento Administrativo Uniforme como remedio exclusivo para revisar dichas actuaciones. Ahora bien, el *mandamus* podría estar disponible si se trata de una acción *ultra vires* de la agencia para la cual habría que determinar si ésta actuó dentro de los poderes conferidos por su ley orgánica o si, por el contrario, se extralimitó. Demetrio Fernández, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, Editorial Forum, 1993, págs. 569-570.

Por ser un recurso extraordinario, el *mandamus* sólo debe emitirse cuando el peticionario carece de un recurso adecuado y eficaz para vindicar sus derechos en el curso ordinario de la ley. 32 L.P.R.A. sec. 3423. Por tal razón, normalmente se invoca como limitación para recurrir al *mandamus* el no haber agotado los remedios administrativos. Ello no supone una norma inflexible, ya que al considerar su expedición, el factor de mayor importancia y peso es el posible impacto al interés público. *Noriega Rodríguez v. Hernández Colón, supra; González Saldaña v. Tribunal Superior*, 92 D.P.R. 477, 487 (1965).

En asuntos de gran interés público como es la conservación del ambiente, la ley específicamente provee para que se inste un recurso de *mandamus* en los casos apropiados. Así, el artículo 20 de la Ley Sobre Política Pública Ambiental, *supra*, dispone, en su parte pertinente, que cualquier persona natural o jurídica afectada por la falta de implantación de la ley podrá acudir al Tribunal de Primera Instancia en solicitud de que se expida un *mandamus* para que se de cumplimiento a sus disposiciones. El aludido artículo específicamente dispone que *"dicho recurso no procederá para cuestionar una decisión de la Junta de Calidad Ambiental dando por cumplidos los requisitos de la sec. 1124 (c) de este título al considerar un documento ambiental, lo que se hará exclusivamente en virtud de lo dispuesto en la Ley de Procedimiento Administrativo Uniforme."*

En cuanto a la solicitud de sentencia declaratoria, su propósito es lograr determinaciones judiciales sobre ilegalidad de actuaciones o declaración de derechos que pongan fin a controversias. El mecanismo no puede utilizarse para sustituir los recursos jurisdiccionales que la ley específicamente provee para revisar actuaciones administrativas.

Lo solicitado por el Municipio en la demanda de *mandamus* y sentencia declaratoria se refiere claramente a la impugnación de diversas decisiones de la Junta de Planificación y ARPE en el proceso administrativo seguido para la aprobación de la consulta en cuestión.

La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, (L.P.A.U.) establece el procedimiento a seguir para la revisión de las decisiones administrativas. A estos efectos, la sección 4.2, 3 L.P.R.A. sec. 2172, dispone que una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente, podrá presentar una solicitud de revisión ante el Tribunal de Circuito de Apelaciones. Mediante enmienda de 1999 a la sección 4.2, *supra*, se dispuso específicamente que la revisión judicial será el recurso exclusivo para revisar los méritos de una decisión administrativa.

La anterior disposición es complementaria de la Ley de la Judicatura, que en su artículo 4.001 (g), 4 L.P.R. A. sec. 22h (g), confiere competencia al Tribunal de Circuito de Apelaciones para revisar mediante auto de revisión las decisiones de las agencias administrativas.

El tribunal apelado basó su dictamen en que la competencia para revisar la corrección y legalidad de las decisiones de las agencias administrativas en las autorizaciones impugnadas, correspondía al Tribunal de Circuito de Apelaciones. Correctamente señaló que no es relevante el título que el Municipio haya dado al recurso, cuando en efecto lo que reclama es que se revisen las determinaciones de las agencias en cuanto al proyecto de Río Construction.

Los diversos planteamientos del Municipio ante el Tribunal de Primera Instancia por medio de la demanda, a saber, violaciones procesales al autorizar la consulta, falta de cumplimentar formularios, violación a los planes municipales, incumplimiento con documentos ambientales, correspondía presentarlos bajo el procedimiento jurisdiccional de revisión judicial.

No está en controversia que el Municipio tenía conocimiento del procedimiento administrativo ante la Junta de Planificación para la aprobación de la consulta. Las decisiones administrativas que se impugnan en la demanda fueron notificadas al Municipio y en éstas se advertía a las partes de su derecho a solicitar reconsideración y revisión judicial. Así, pues, el Municipio tuvo a su disposición los recursos provistos por la ley, apropiados para revisar la decisión que cuestiona en la demanda.

En definitiva, mediante la demanda instada, se solicitó al tribunal que pasara juicio sobre los méritos de los dictámenes administrativos bajo diversos planteamientos de violaciones de ley, lo que es contrario al esquema procesal establecido en la Ley de Procedimiento Administrativo Uniforme para la revisión de las actuaciones de las agencias administrativas. Esa labor corresponde en forma exclusiva al Tribunal de Circuito de Apelaciones. Por tanto, no erró el tribunal al dictaminar que no tenía competencia para adjudicar dichos planteamientos.

En términos más específicos, el Municipio plantea que erró el tribunal al denegar el *mandamus* dispuesto por el artículo 20 de la Ley Sobre Política Pública Ambiental, *supra*, ante las violaciones de ley que señala. Arguye que habiéndose autorizado en la consulta usos industriales pesados, según catalogados en la sección 29.00 del Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4., éstos son incompatibles con la determinación de la Junta de Planificación de autorizar parámetros que son industriales livianos. Plantea que la Junta autorizó los usos solicitados sin que se realizara la Declaración de Impacto Ambiental (DIA) requerida por ley y recomendada por la oficial examinadora. Añade que la DIA forzosamente tiene que llevarse a cabo antes de que se emita autorización alguna y no después de autorizada la consulta.

El tribunal apelado, ante la naturaleza de las alegaciones sobre violaciones ambientales, área de arraigo constitucional por cuyo cumplimiento están llamados a velar los tribunales, analizó los señalamientos del Municipio bajo la posible procedencia del recurso especial de *mandamus* dispuesto en el artículo 20, *supra*. Resolvió que éste no procedía, toda vez que el documento ambiental presentado por Río Construction en ocasión de la enmienda a la consulta de ubicación para relocalizar la planta productora de hormigón asfáltico, cumplió con las recomendaciones en cuanto a los usos industriales y a su impacto acumulativo en el ambiente.

La naturaleza de los planteamientos del recurso, en cuanto a los aspectos ambientales, ameritan el análisis más detenido de la ley y del expediente respecto a los mismos.

La Ley Sobre Política Pública Ambiental se creó bajo lo dispuesto en la sección 19 del Artículo VI de la Constitución del Estado Libre Asociado de P.R., que establece como política pública la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo de éstos para beneficio de la comunidad. El artículo 4 de la referida ley, 12 L.P.R.A. sec. 1124, dispone:

*"Se ordena que al máximo grado posible se interpreten, implementen y administren todas las leyes y cuerpos reglamentarios vigentes en estricta conformidad con la política pública enunciada en este capítulo. Así mismo, se ordena a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus subdivisiones políticas, que en la implementación de la política pública de este capítulo, cumplan con las siguientes normas:*

*(a) Utilizar un enfoque sistemático interdisciplinario que asegurará el uso integrado de las ciencias naturales y sociales y del arte de embellecimiento natural artístico al hacer planes y tomar decisiones que puedan tener un impacto en el medio ambiente del hombre.*

*(b) Identificar y desarrollar métodos y procedimientos en consulta con la Junta de Calidad Ambiental establecida bajo el Subcapítulo II de este capítulo, que aseguren no sólo la consideración de factores económicos y técnicos, sino igualmente aquellos factores referentes a los valores y amenidades establecidos, aun cuando no estén medidos y evaluados económicamente.*

*(c) Incluir en toda recomendación o informe propuesta de legislación, y emitir, antes de efectuar cualesquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente, una declaración escrita y detallada sobre:*

*(1) El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;*

*(2) cualesquiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental;*

*(3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;*

*(4) la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y*

*(5) cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara.*

*Antes de que el organismo concernido incluya o emita la correspondiente declaración de impacto ambiental, el funcionario responsable del mismo consultará y obtendrá la opinión que sobre la legislación propuesta, la acción a efectuarse o la decisión gubernamental a promulgarse tenga cualquier otro organismo gubernamental con jurisdicción o injerencia sobre el impacto ambiental de dicha legislación, acción o decisión."*

Dentro de los límites que fijan la Ley Núm. 9, *supra*, y las directrices de la Junta de Calidad Ambiental, corresponde al organismo gubernamental auspiciador del proyecto decidir si requiere o no una DIA para el proyecto propuesto y determinar su contenido, así como la exactitud de sus datos y la solidez de sus juicios analíticos. *Colón Cortés v. Carlos I. Pesquera*, 150 D.P.R. __ (2000), **2000 J.T.S. 72**, pág. 990. Lo relevante al tomar esa determinación, es si la acción proyectada afecta significativamente la calidad del medio ambiente. En términos más específicos, se requiere una DIA en cualquier proyecto con efectos significativos primarios o secundarios sobre el medio ambiente, que pueda violar las normas de calidad ambiental establecidas por la JCA, que conlleva la utilización de la infraestructura disponible, que esté ubicado en zona de contaminación, que en conjunto con otros proyectos podría tener impacto significativo acumulativo, que sea de relleno sanitario de desperdicios sólidos y fuente de mayor emisión. Sección 5.2 del Reglamento Sobre Declaraciones de Impacto Ambiental, Núm. 3106, de 4 de junio de 1984 (Reglamento sobre DIA).

En el presente caso, no se requirió al proponente una DIA, ni ello fue recomendado por la oficial examinadora como alega el apelante. La recomendación de la oficial examinadora fue a los efectos de que, previo a que se tomara una determinación sobre el proyecto, se suplementara una evaluación ambiental que incluyera cada uno de los usos propuestos en la consulta. Recomendó, además, la autorización del proyecto una vez se determinara que no ocasionaría impacto ambiental adverso o que de ocasionarlo, pudiera ser mitigado. Apéndice del recurso, pág. 90.

A diferencia de la DIA, la Evaluación Ambiental (EA) es un proceso público conciso cuyo propósito es proveer suficiente información en un documento para que la agencia proponente determine si se requiere la preparación de una DIA Preliminar o una DIA No-Significativo (D-N). Sección 3.1.1, Reglamento Sobre DIA.\

Una agencia debe preparar una EA en aquellos casos en que la agencia proponente tiene duda sobre la acción a tomar, no ha determinado si será necesario o no preparar una DIA, cuando sea una acción similar a una para las que normalmente se requiere una DIA, pero circunstancias especiales podrían causar que no ocurra impacto ambiental significativo; o cuando es una acción similar a una de las que normalmente no requiere una DIA, pero circunstancias especiales podríar ocasionar el que ocurriere algún impacto ambiental significativo. Sección 3.2.1., *Ibid*. El Reglamento sobre DIA detalla los requisitos que deberá contener una EA, en resumen: descripciones de ubicación propuesta con componentes físicos y bióticos y de la acción propuesta, plano conceptual del desarrollo, análisis de impacto ambiental y de mitigación, efecto de la utilización de la infraestructura y cuando proceda, un plan de erosión y sedimentación de los terrenos. Se requiere la inclusión de información específica sobre los recursos naturales, permisos, infraestructura. Sección 3.3, *Ibid*.

Del expediente surge que en cada una de las etapas del proyecto se requirió la aprobación de la Junta de Calidad Ambiental de los documentos ambientales sometidos por el proponente y se condicionó la aprobación de la consulta las condiciones impuestas por la JCA y ARPE. El 26 de agosto de 1991, previo a la aprobación de la consulta, la JCA evaluó el proyecto y determinó que la agencia había cumplido con las disposiciones de la Ley 9, *supra*. Requirió que previo al establecimiento de cada uno de los cuatro solares industriales se debería preparar y someter para evaluación el documento ambiental individual. Las recomendaciones realizadas por la JCA fueron incorporadas en la resolución de aprobación de la Junta de Planificación en ocasión de aprobar la formación de los cuatro solares en consulta el 13 de marzo de 1992. Se especificó, entonces, que ARPE podría hacer requerimientos adicionales a los contemplados en la resolución de ser necesarios en etapas posteriores. Así también, la Junta de Planificación al reabrir y autorizar la consulta, el 13 de febrero de 1996, dispuso que quedaban en todo vigor todas las otras partes del informe anterior no alteradas por la extensión decretada.

Expresó que la aprobación de la consulta no implicaba la aprobación de etapas subsiguientes, las cuales deberían someterse a la consideración de ARPE. De esta manera mantuvo todas las condiciones impuestas por la JCA y ARPE.

El proyecto fue evaluado nuevamente por la JCA en fases posteriores. Así se desprende de las comunicaciones de esta agencia de 2 de septiembre de 1999 y 1 de noviembre de 1999, en ocasión de otorgar el permiso de construcción de la planta manufacturera de hormigón asfáltico y de 24 de febrero de 2000, al aprobar la operación de la referida planta. Apéndice del recurso, págs. 306-312 y 314-318.

El 19 de abril de 2000, Río Construction presentó ante la Junta de Planificación la Evaluación Ambiental tomando en cuenta los impactos acumulativos de las cuatro actividades industriales, según requerido. El documento fue acogido por la Junta, el 24 de abril de 2000. El 30 de mayo de 2000, la JCA determinó cumplidas las disposiciones de la Ley 9, a someterse ante su consideración la Evaluación Ambiental. Apéndice del recurso, pág. 328.

En resumen, consta en el expediente un documento ambiental previo a la consulta de ubicación; un documento ambiental previo a la otorgación del permiso de construcción y operación de la planta dosificadora

de hormigón asfáltico, y un documento ambiental durante el proceso de enmienda de la consulta de ubicación y previo al inicio de las operaciones de las actividades propuestas. Estos documentos analizan el impacto ambiental conforme los requisitos reglamentarios y concluyen que el proyecto no conlleva impacto ambiental significativo, con lo que concurrieron la Junta de Planificación y la JCA.

Entendemos que no erró el tribunal apelado al denegar el recurso especial de *mandamus* bajo su determinación de que no existe en el caso una violación *prima facie* a la Ley de Política Pública Ambiental. El apelante no ha demostrado, ante este foro, que medió un incumplimiento de tal naturaleza que hiciera procedente el aludido recurso. Como previamente expuesto, el recurso de *mandamus* provisto en el artículo 20, *supra*, no tiene como propósito la revisión en los méritos de las decisiones de la agencia, sino obligar a la agencia concernida a dar cumplimiento a los deberes ministeriales indelegables que le impone el ordenamiento jurídico ambiental. No podemos afirmar bajo los planteamientos del Municipio, a la luz del expediente y de la ley, que las agencias incumplieron en este caso con tal obligación.

### III
En virtud de lo expuesto, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

**ESCOLIO 2001 DTA 103**

**1.** A pesar de habérsele requerido, ARPE no compareció.